Hugh Browne v. Commissioner.
Browne v. Commissioner
Docket No. 4438-62.
United States Tax Court
T.C. Memo 1965-165; 1965 Tax Ct. Memo LEXIS 165; 24 T.C.M. (CCH) 874; T.C.M. (RIA) 65165; June 23, 1965
Jules H. Sigal, 1025 Connecticut Ave., Washington, D.C., for the *166 petitioner. Joseph N. Ingolia, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies and additions to tax in petitioner's income tax for the years 1950 to 1959, inclusive, in the following amounts: Additions to Tax
Sec. 293(b),
1939 I.R.C.
Sec. 294
Sec. 6653(b),
(d)(1)(A),
Year
Deficiency
1954 I.R.C.
1939 I.R.C.
1950
$1,583.41
[1] $ 791.71
$151.27
1951
2,692.14
[1] 1,346.07
242.28
1952
2,293.09
[1] 1,146.55
240.66
1953
1,750.99
[1] 875.50
159.61
1954
6,379.71
3,189.86
590.12
1955
5,154.60
2,577.30
1956
7,627.28
3,943.64
1957
6,047.74
3,023.87
1958
1,687.97
843.99
1959
2,350.20
1,175.10
In his petition petitioner alleged that respondent erred in determining any deficiencies on account of the statute of limitations, in determining that the taxable net income should be increased in the amounts set out in the statement attached to the notice of deficiency upon the basis of increase in net worth adjusted for personal and other nondeductible amounts paid, in determining that petitioner was subject to the penalties *167 imposed, and in disallowing petitioner's "head of the household tax computation" for 1959. In his allegations of fact petitioner alleged that under the method used by respondent in his computation of tax shown in the notice of deficiency respondent included in petitioner's income amounts in excess of the income received by petitioner from all sources, that the amounts included by respondent in his calculation of petitioner's income as "cost of living"expenses were in excess of the amounts expended for that purpose, that in his calculation of petitioner's income respondent arbitrarily included during certain years the value of certain land and the value of a building thereon in amounts in excess of their true values or costs, that respondent in his calculation of petitioner's income included for certain years the cost of an air conditioner in an amount already included in the cost of a building, included for certain years an amount for "Inventory-Glassware, etc." in excess of its true cost and value, and included for the year 1954 under "Real Estate Loans Payable" a construction loan in an amount in excess of the loan received and advanced by the lender in that year, and that petitioner *168 during 1959 maintained a household constituting his principal abode in which a dependent resided during that year. Respondent's answer, in addition to denying the allegations in the petition, affirmatively alleged those matters customary in cases in which respondent computes the tax liability of a taxpayer and additions thereto by the use of the increase in net worth plus nondeductible expenditures method, including an allegation that petitioner failed to keep adequate books for the years in question from which respondent could determine his correct taxable income. In all material respects respondent's affirmative allegations were denied in petitioner's reply. The case was set for trial on September 21, 1964. On that date petitioner filed an amended petition and the date of September 25, 1964, was designated for the trial herein. On the latter date petitioner's motion for continuance was granted to October 29, 1964. The amended petition added allegations to the effect that in calculating petitioner's income respondent included under "Liabilities and Depreciation" amounts which were substantially understated, included under "Real Estate" the cost of a night club in an amount which *169 was not the real cost to petitioner, included under "Real Estate" for 1959 an air conditioner which was not purchased in that year, and erroneously included under "Assets" for the years 1956 through 1959 an ice cuber. Over 4 months after the trial and after all of the briefs had been filed herein, petitioner moved for leave to file another amendment to his petition primarily for the purpose of raising for the first time an issue involving a purported demolition loss for the year 1953, and also to specifically allege error in respondent's use of the net worth method of determining petitioner's income for the taxable years. This motion was denied. The issues presented for our decision are: (1) Whether petitioner had unreported income in each of the years 1950 through 1959 as computed by respondent by means of the net worth plus nondeductible expenditures method and, if so, the amount thereof; (2) whether any part of the deficiencies for the years in question was due to fraud with intent to evade tax; (3) whether any of the years 1950 to 1958, inclusive, are barred by the statute of limitations; (4) whether the petitioner is liable for additions to tax under section 294(d)(1)(A) of *170 the Internal Revenue Code of 1939 for each of the years 1950 through 1954; and (5) whether petitioner was head of a household in 1959. With regard to the itemized figures and entries set forth in the net worth statement and schedules attached to respondent's answer, the petitioner conceded during the trial that the items of $391.68 for an air conditioner appearing as an asset in the schedules for 1952, 1953, and 1954 were correct and respondent conceded that an item of $397.50 for an air conditioner in 1956 should be eliminated. Subject to these later concessions the parties stipulated in writing at the trial herein that the itemized facts and figures appearing in the net worth statement and supporting schedules are correct with certain exceptions, giving rise to subissues under the first issue stated above, which subissues are as follows: (1) Whether or not an entry for "Ice Cuber" appearing in the net worth statement in the schedule labeled "Assets" for the years 1956 through 1959 should be eliminated in any or all years. (2) Whether or not the respondent's inclusion of the entries under "Prepaid Interest" appearing in the "Assets" schedule for the years 1950 through 1959 is *171 valid. (3) Whether or not the respondent's inclusion of the entries opposite "Air Conditioner" for the year 1955 on the schedule labeled "Real Estate" under 2001 Benning Road and the entry for the same year opposite "Washington Gas" on the schedule labeled "Liabilities and Depreciation" are proper for that year rather than for 1954, and whether the entries themselves are correct in amount. (4) Whether or not the entries for depreciation for various items under "2001 Benning Road" and under "1950 Cadillac," "1953 Cadillac," "1954 Cadillac," and "1957 Cadillac" on respondent's schedule labeled "Schedule of Depreciation" for the years 1950 through 1959 are correct. (5) Whether or not the entries opposite "Real Estate Loans" appearing on the "Assets" schedule of respondent for the years 1953 through 1959 reflecting prepaid bonuses are correct. (6) Whether or not the entries opposite "Land" as determined by the respondent under "2001 Benning Road" on the schedule labeled "Real Estate" for the years 1953 through 1959 are correct. (7) Whether or not the entries opposite "Building" as determined by the respondent for the years 1953 through 1959 under "2001 Benning Road" on the "Real *172 Estate" schedule are correct. (8) Whether or not the entries opposite "Arabian Room" for the years 1955 through 1959 under "2001 Benning Road" in the schedule entitled "Real Estate" are correct as determined by respondent. (9) Whether or not the entries opposite "Inventory-Glassware, etc." for the years 1956 through 1959 under the heading "2001 Benning Road" on the "Real Estate" schedule are correct as determined by respondent. (10) Whether or not the entries opposite "Cost of Living" for the years 1950 through 1959 in the schedule entitled "Net Worth Statement" are correct as determined by respondent. Findings of Fact Some of the facts have been stipulated by the parties. We find these facts to be as stipulated and incorporate herein by this reference the stipulation, together with the exhibits identified therein and attached thereto. The petitioner is a doctor who was practicing medicine in the District of Columbia during the years 1950 through 1959, and prior thereto. He commenced the practice of medicine in 1943. During the years in question the petitioner filed his income tax returns with the district director at Baltimore, Maryland. In addition to his practice, *173 petitioner owned and personally managed during the taxable years various real estate properties in the District of Columbia, all located within a radius of 1 mile from his home. Prior to his entry into the practice of medicine, petitioner had no taxable income. In the years 1943 to 1949, inclusive, he reported very little income and the taxes he paid were minimal. During the years under consideration petitioner was not married but had a daughter by a previous marriage. In 1952 petitioner acquired property located at 2001 Benning Road, N.E., Washington, D.C., at a cost of $18,562.90. He intended to renovate, if possible, the building upon it for use as a combination office and home. After the purchase of the property he employed an architect to make proper plans to carry out his intention. The architect informed him in the spring of 1953 that it would be impractical to do the construction work necessary for such renovation of the existing building in view of the building code provisions of the District of Columbia. In the fall of 1953 the petitioner, following the recommendation of the architect, demolished the then existing building at 2001 Benning Road, N.E., at a cost of $1,500. *174 Soon after the demolition of the old building was completed, the construction of a new building was begun. It was completed on May 24, 1955. Part of the cost of this building was paid from the proceeds of mortgage loans. As of January 26, 1956, petitioner's mortgage indebtedness on this property was $83,000. In his tax return for that year petitioner reported the cost of the new building as $138,593.82. In his 1956 return he showed the cost of this building as $139,195.36, while in his 1957 and 1959 returns [1] the cost of the building was noted as $139,195.36 and $126,245.66, respectively. In his 1956 return petitioner listed as a depreciable asset an air-conditioning and heating unit in that building at a cost of $15,284.70. In his 1957 and 1959 returns he lists this unit as a depreciable asset at a cost of $12,949.70. This latter amount is the amount by which the depreciable cost of the building as shown in his returns in 1956 and 1957 ($139,195.36) exceeds the depreciable cost of the building as shown in his 1959 return ($126,245.66). Depreciation deductions based on these costs were taken by petitioner in these returns. These cost figures for the building were overstated by petitioner *175 by substantial amounts. The cost of such building was $103,877.68. In 1959 petitioner replaced the roof of this building at a cost of $1,400. On February 15, 1956, the petitioner made an application for an FHA loan for the purpose of making $7,000 worth of improvements to the Benning Road property. In the application petitioner indicated that he acquired the property on May 19, 1955, at a cost of $150,000. Petitioner certified over his signature that the statements made in the application were "true, accurate and complete * * *" to the best of his knowledge and belief, Contained in the application was a warning that "[any] person who knowingly makes a false statement or a misrepresentation in this application shall be subject to a fine of not more than $5,000 or by imprisonment for not more than 2 years, or both, under provisions of the United States Criminal Code." In 1955 petitioner purchased an air-conditioning and heating unit from the Washington Gas Light Company for the amount of $13,408.17. *176 Added to this amount were sales taxes of $210.28 and carrying charges amounting to $1,316.25. Petitioner made a down payment of $2,649.70 on June 17, 1955, and further payments in 1955 as follows: August 19 - $255.82, October 6 - $511.88, November 10 - $255.94, and December 5 - $255.94. In December 1956 petitioner completed construction of the Arabian Room in the basement of the building at 2001 Benning Road, N.E. This room was rented as a night club to various organizations or individuals. All that the petitioner provided to lessees of the Arabian Room was the use of the room, glassware, and two cases of soda. The cost of constructing the Arabian Room was $15,799.19. The cost of the equipment of the Arabian Room such as glassware and soda, which was present therein at any time, was not more than $200. During the years 1950 through 1959 petitioner owned successively several automobiles, each of which was a Cadillac. He drove approximately 14,000 miles per year. During these years he drove on an uncertain number of occasions to race tracks and in each year to a vacation resort. Petitioner's use of these automobiles for business purposes was not in excess of the 80 percent of *177 their total use allocated by respondent to business use in his computations, specifically in computing depreciation figures thereon and the "Personal Loss on Cars." On June 13, 1950, the petitioner made application for an FHA loan. Under the heading "Present salary or net income from business" he wrote $12,000 per year. Under the heading "Other income (net)" he placed $5,000 gross per year from rents. Over his signature petitioner certified this information to be correct. The application contained a warning as to the criminal penalty for making a false statement. On similar FHA loan applications made May 25, 1953, January 5, 1955, February 15, 1956, January 1957, and September 11, 1957, petitioner made the following representations: Under the heading of "Present salary or net income from business" he placed these amounts, respectively: "$1000 per month"; "$1500 per month"; $1500 per month"; "$20,000 * * * per year"; and "$1,800 per month." Under the heading "Other income (net)" he noted the following amounts, respectively: " $600 per month * * * [from] rents"; " $500 per month * * * [from] rents"; " $600 per month * * * [from] rents"; "$26,000 * * * per year [from] rents"; *178 and $1,200 per month * * * [from] rentals." All of these FHA loan applications contained admonitions of criminal penalties for false statements. On December 1, 1955, petitioner made an application for a loan with The City Bank. Under "My salary," he placed "$20,000 per year." On April 9, 1956, the petitioner made an application for a loan with the Anacostia National Bank of Washington. Under "Salary or earnings" he stated "$20,000 per year - $20,600 gross rents." On July 8, 1957, the petitioner made an application for a loan with The City Bank. Under "My salary" he stated $18,000 per yr." Under "Income other than salary" he stated "$25,000 per yr." Petitioner completed his own income tax returns for the years 1950, 1951, 1952, 1953, 1954, 1955, and 1959. For the year 1956 David Adams, an accountant, prepared petitioner's tax return. Curtis Young, also an accountant, prepared petitioner's tax returns for the years 1957 and 1958. The accountants' work was based on data furnished to them by petitioner. Petitioner reported adjusted gross income for the years 1950 through 1959 in the following amounts. The legends (P) and (R) indicate professional income and rental and/or other *179 income, respectively. 1950
$2,526.64 (P)
(21.44) (R)
1951
1,481.55 (P)
320.69 (R)
1952
2,643.61 (P)
(145.57) (R)
1953
3,574.01 (P)
(328.69) (R)
1954
2,029.89 (P)
(906.65) (R)
1955
$2,928.97 (P)
(6,366.26) (R)
1956
(222.30) (P)
2,327.47 (R)
1957
1,061.65 (P)
(427.46) (R)
1958
2,156.25 (P)
2,959.54 (R)
1959
4,751.29 (P)
3,151.39 (R)
Respondent computed the petitioner's taxable income for these years by means of the net worth plus nondeductible expenditures method. He determined the following understatements in petitioner's income for the years 1950 through 1959: Taxable Income
Net Worth
Petitioner's
Under-
Year
Method
Returns
statement
1950
$ 8,881.77
$1,758.26
$ 7,123.51
1951
10,588.98
501.24
10,087.74
1952
9,858.01
2,316.04
7,541.97
1953
7,357.02
700.92
6,656.10
1954
18,339.06
(492.48)
18,831.54
1955
15,903.41
(4,168.08)
20,071.49
1956
21,120.14
[1] 2,105.17
19,014.97
1957
17,695.47
[1] 634.19
17,061.28
1958
8,614.50
2,368.02
6,246.48
1959
12,004.43
4,965.44
7,038.99
*180 Our reconstruction of petitioner's income for the years 1950 through 1959 follows on Schedules A, B, and C, infra. Schedule A notes the assets, Schedule B records the liabilities and accumulated depreciation, and Schedule C contains a computation of petitioner's yearly income by means of the net worth plus nondeductible expenditures method. Each item which was in dispute in this proceeding is noted with the letter "(d)." All other items were not disputed by the parties. SCHEDULE A - ASSETS
Year Ended
12/31/49
12/31/50
12/31/51
Cash in Banks
$ 32.38
$ 140.15
$ 63.65
Automobiles
1,300.00
4,340.18
4,340.18
Notes Receivable
2,846.44
2,225.00
1,992.81
Adding Machine
Typewriter
Television
576.00
Air Conditioner
253.25
[1] Air Conditioner Furniture
2,868.48
2,868.48
2,868.48
Furniture
Ice Cuber (d)
Niagara Massager
Balance Construction Loan
Prepaid Interest (d)
FHA Loans
181.49
143.39
177.05
Air Conditioner
Real Estate Loans - Prepaid
Bonuses (d)
Real Estate, Cost of which
is Undisputed
50,121.15
63,772.45
66,132.05
Subtotals
$ 57,349.94
$ 73,489.65
$ 76,403.47
2001 Benning Road, N.E. (d)
Land (d)
Building (Completed May
24, 1955) (d)
Air Conditioner No. 1 (d)
X-Ray Room
Arabian Room (d)
[2] Air Conditioner Equipment, Glassware,
etc. (d)
Air Conditioner
Roof
Air Conditioner
Total Assets
$ 57,349.94
$ 73,489.65
$ 76,403.47
Year Ended
12/31/55
12/31/56
Cash in Banks
$ 837.90
$ 718.27
Automobiles
4,742.10
4,742.10
Notes Receivable
Adding Machine
96.90
96.90
Typewriter
163.71
163.71
Television
(Burned)
Air Conditioner
(Stolen)
[1] Air Conditioner (Stolen)
Furniture
2,868.48
2,868.48
Furniture
300.00
300.00
Ice Cuber (d)
724.50
Niagara Massager
264.18
Balance Construction Loan
Prepaid Interest (d)
FHA Loans
827.78
1,156.48
Air Conditioner
969.95
744.38
Real Estate Loans - Prepaid Bonuses
3,186.37
2,558.47
(d)
Real Estate, Cost of which is
Undis-
puted
81,899.34
81,899.34
Subtotals
$ 95,892.53
$ 96,236.81
2001 Benning Road, N.E. (d)
Land (d)
$ 18,562.90
$ 18,562.90
Building (Completed May 24, 1955)
103,877.68
103,877.68
(d)
Air Conditioner No. 1 (d)
13,408.17
13,408.17
X-Ray Room
2,400.00
Arabian Room (d)
1,390.32
15,799.19
[2] Air Conditioner Equipment, Glassware, etc. (d)
200.00
Air Conditioner
Roof
Air Conditioner
Total Assets
$233,131.60
$250,484.75
*181 SCHEDULE A - ASSETS
Year Ended
12/31/52
12/31/53
12/31/54
Cash in Banks
$ 229.24
$ 2,725.26
$ 1,061.62
Automobiles
4,340.18
3,902.59
4,742.10
Notes Receivable
1,744.84
1,482.40
Adding Machine
96.90
Typewriter
163.71
Television
576.00
576.00
576.00
Air Conditioner
253.25
253.25
253.25
[1] Air Conditioner 391.68
391.68
391.68
Furniture
2,868.48
2,868.48
2,868.48
Furniture
300.00
Ice Cuber (d)
Niagara Massager
Balance Construction Loan
13,495.81
Prepaid Interest (d)
FHA Loans
325.57
733.55
844.57
Air Conditioner
Real Estate Loans - Prepaid
Bonuses (d)
500.00
4,158.66
Real Estate, Cost of which
is Undisputed
67,132.05
81,899.34
81,899.34
Subtotals
$ 77,861.29
$ 95,332.55
$110,852.12
2001 Benning Road, N.E. (d)
Land (d)
$ 18,562.90
$ 18,562.90
$ 18,562.90
Building (Completed May
24, 1955) (d)
2,254.14
73,410.35
Air Conditioner No. 1 (d)
X-Ray Room
Arabian Room (d)
[2] Air Conditioner Equipment, Glassware,
etc. (d)
Air Conditioner
Roof
Air Conditioner
Total Assets
$ 96,424.19
$116,149.59
$202,825.37
Year Ended
12/31/57
12/31/58
12/31/59
Cash in Banks
$ 1,499.83
$ 82.02
$ 538.74
Automobiles
5,024.50
5,024.50
5,024.50
Notes Receivable
Adding Machine
96.90
96.90
96.90
Typewriter
163.71
163.71
163.71
Television
Air Conditioner
[1] Air Conditioner Furniture
2,868.48
2,868.48
2,868.48
Furniture
300.00
300.00
300.00
Ice Cuber (d)
724.50
724.50
724.50
Niagara Massager
264.18
264.18
264.18
Balance Construction Loan
Prepaid Interest (d)
FHA Loans
1,348.87
861.57
827.89
Air Conditioner
451.14
225.57
Real Estate Loans - Prepaid Bonuses
2,629.87
2,870.92
2,526.36
(d)
Real Estate, Cost of which is
Undis-
puted
83,847.10
83,759.70
84,099.70
Subtotals
$ 99,219.08
$ 97,242.05
$ 97,434.96
2001 Benning Road, N.E. (d)
Land (d)
$ 18,562.90
$ 18,562.90
$ 18,562.90
Building (Completed May 24, 1955)
103,877.68
103,877.68
103,877.68
(d)
Air Conditioner No. 1 (d)
13,408.17
13,408.17
13,408.17
X-Ray Room
2,400.00
2,400.00
2,400.00
Arabian Room (d)
15,799.19
15,799.19
15,799.19
[2] Air Conditioner 1,195.00
1,195.00
1,195.00
Equipment, Glassware, etc. (d)
200.00
200.00
200.00
Air Conditioner
2,150.00
Roof
1,400.00
Air Conditioner
1,651.58
1,651.58
Total Assets
$254,662.02
$254,336.57
$258,079.48
*182 SCHEDULE B - LIABILITIES AND ACCUMULATED DEPRECIATION
Date Ac-
Year Ended
Rate
quired
Cost
12/31/49
12/31/50
Accounts Payable
Loans and Notes
$ 4,618.73
$ 6,151.80
Payable
Washington Gas
Company (d)
FHA Loans
2,911.95
2,593.93
Real Estate Loans
30,707.11
39,500.30
Real Estate
3,065.51
4,707.48
Depreciation
other than
Benning Road (d)
Other
Depreciation,
2001 Benning
Road, N.E.
Building (d)
2%
5/24/55
$103,877.68
Air Conditioner
5%
5/24/55
13,408.17
No. 1 (d)
X-Ray Room
3%
7/ 1/56
2,400.00
Arabian Room (d)
10%
12/ 1/56
15,799.19
Air Conditioner
10%
7/ 1/57
1,195.00
(d)
Air Conditioner
10%
7/ 1/58
1,651.58
(d)
Roof
10%
7/ 1/59
1,400.00
Air Conditioner
10%
7/ 1/59
2,150.00
(d)
Adding Machine
10%
6/ 8/54
96.90
Typewriter
10%
5/20/54
163.71
Television
20%
7/ 1/51
576.00
Air Conditioner
20%
7/ 1/51
253.25
Air Conditioner
20%
7/ 1/52
391.68
Furniture
10%
12/16/49
2,868.48
286.85
Furniture
10%
10/ 1/54
300.00
Ice Cuber (d)
10%
12/ 1/56
724.50
1950 Cadillac (d)
25%
6/27/50
3,472.14
434.02
1953 Cadillac (d)
25%
11/10/53
[1] 2,949.81 1954 Cadillac (d)
25%
3/19/54
3,717.87
1957 Cadillac (d)
25%
7/ 8/57
3,758.93
Totals
$ 41,303.30
$ 53,674.38
*183 SCHEDULE B - LIABILITIES AND ACCUMULATED DEPRECIATION
Year Ended
12/31/51
12//31/52
12/31/53
12/31/54
12/31/55
Accounts Payable
$ 253.00
$ 121.00
$ 5,094.83
$ 864.81
Loans and Notes
3,703.18
2,124.59
5,703.20
14,870.33
20,061.22
Payable
Washington Gas
11,005.42
Company (d)
FHA Loans
1,763.99
3,285.24
7,894.00
9,137.63
7,237.37
Real Estate Loans
35,347.92
45,934.81
56,263.96
124,408.27
134,108.84
Real Estate
6,769.75
8,975.00
11,431.41
13,922.93
16,348.40
Depreciation
other than
Benning Road (d)
Other
Depreciation,
2001 Benning
Road, N.E.
Building (d)
1,211.90
Air Conditioner
391.09
No. 1 (d)
X-Ray Room
Arabian Room (d)
Air Conditioner
(d)
Air Conditioner
(d)
Roof
Air Conditioner
(d)
Adding Machine
5.65
15.34
Typewriter
9.55
25.92
Television
57.60
172.80
288.00
403.20
(Burned)
Air Conditioner
25.33
75.98
126.63
177.28
(Stolen)
Air Conditioner
39.17
117.51
195.85
(Stolen)
Furniture
573.70
860.55
1,147.40
1,434.25
1,721.10
Furniture
7.50
37.50
Ice Cuber (d)
1950 Cadillac (d)
1,302.06
2,170.10
1953 Cadillac (d)
122.91
1954 Cadillac (d)
697.10
1,626.57
1957 Cadillac (d)
Totals
$ 49,796.53
$ 63,759.24
$ 83,095.02
$170,364.37
$194,655.48
*184 SCHEDULE B - LIABILITIES AND ACCUMULATED DEPRECIATION
Year Ended
12/31/56
12/31/57
12/31/58
12/31/59
Accounts Payable
$ 3,067.21
Loans and Notes
11,412.22
$ 8,586.58
$ 5,625.22
$5,879.22
Payable
Washington Gas
8,446.02
5,118.80
2,559.40
Company (d)
FHA Loans
10,828.37
10,082.39
8,238.46
8,481.00
Real Estate Loans
133,959.50
128,337.43
123,898.88
114,807.19
Real Estate
18,803.86
21,233.91
23,002.48
25,361.69
Depreciation
other than
Benning Road (d)
Other
Depreciation,
2001 Benning
Road, N.E.
Building (d)
3,289.44
5,366.99
7,444.53
9,522.08
Air Conditioner
1,061.50
1,731.91
2,402.32
3,072.73
No. 1 (d)
X-Ray Room
36.00
108.00
180.00
252.00
Arabian Room (d)
131.66
1,711.58
3,291.50
4,871.42
Air Conditioner
59.75
179.25
298.75
(d)
Air Conditioner
82.58
247.74
(d)
Roof
70.00
Air Conditioner
107.50
(d)
Adding Machine
25.03
34.72
44.41
54.10
Typewriter
42.29
58.66
75.03
91.40
Television
Air Conditioner
Air Conditioner
Furniture
2,007.95
2,294.80
2,581.65
2,868.48
Furniture
67.50
97.50
127.50
157.50
Ice Cuber (d)
6.04
78.49
150.94
223.39
1950 Cadillac (d)
1953 Cadillac (d)
1954 Cadillac (d)
2,556.04
1957 Cadillac (d)
469.87
1,409.60
2,349.33
Totals
$195,740.63
$185,371.38
$181,293.75
$178,715.52
*185 SCHEDULE C - NET WORTH STATEMENT
Year Ended
12/31/49
12/31/50
12/31/51
12/31/52
Assets
$ 57,349.94
$ 73,489.64
$ 76,403.47
$ 96,424.19
Liabilities and Accumu-
lated Deprec.
41,303.30
53,674.38
49,796.53
63,759.24
Net Worth
16,046.64
19,815.27
26,606.94
32,664.95
Net Worth Previous Year
16,046.64
19,815.27
26,606.94
Net Worth Increase
3,768.63
6,791.67
6,058.01
Cost of Living (d)
5,800.00
4,600.00
4,600.00
Federal Taxes Paid
97.31
Personal Loss on Cars (d)
Corrected Adjusted Gross
Income
9,568.63
11,488.98
10,658.01
Less: Standard Deduction
[1] (d) 956.86
1,000.00
1,000.00
Corrected Net Income
8,611.77
10,488.98
9,658.01
[2] Personal Exemption Corrected Taxable Income
Net Income Shown on
Return
1,758.26
501.24
2,316.04
Taxable Income Reflected
on Return (Loss)
Additional Income
$ 6,853.51
$ 9,987.74
$ 7,341.97
SCHEDULE C - NET WORTH STATEMENT
Year Ended
12/31/53
12/31/54
12/31/55
12/31/56
Assets
$116,149.59
$202,825.37
$233,131.60
$250,484.75
Liabilities and Accumu-
lated Deprec.
83,095.02
170,364.37
194,655.48
195,740.63
Net Worth
33,054.57
32,461.00
38,476.12
54,744.12
Net Worth Previous Year
32,664.95
33,054.57
32,461.00
38,476.12
Net Worth Increase
389.62
(593.57)
6,015.12
16,268.00
Cost of Living (d)
4,600.00
4,800.00
4,800.00
4,800.00
Federal Taxes Paid
380.95
22.40
Personal Loss on Cars (d)
508.04
197.38
Corrected Adjusted Gross
Income
5,878.61
4,426.21
10,815.12
21,068.00
Less: Standard Deduction
[1] (d) 587.86
442.62
1,000.00
1,000.00
Corrected Net Income
5,290.75
3,983.59
9,815.12
20,068.00
[2] Personal Exemption 600.00
600.00
600.00
Corrected Taxable Income
3,383.59
9,215.12
19,468.00
Net Income Shown on
Return
700.92
Taxable Income Reflected
on Return (Loss)
(492.48)
(4,168.08)
[3] 1,294.65 Additional Income
$ 4,589.83
$ 3,876.07
$ 13,383.20
[4]$ 18,173.35 *186 SCHEDULE C - NET WORTH STATEMENT
Year Ended
12/31/57
12/31/58
12/31/59
Assets
$254,662.02
$254,336.57
$258,079.48
Liabilities and Accumu-
lated Deprec.
185,371.38
181,293.75
178,715.52
Net Worth
69,290.64
73,042.82
79,363.96
Net Worth Previous Year
54,744.12
69,290.64
73,042.82
Net Worth Increase
14,546.52
3,752.18
6,321.14
Cost of Living (d)
4,800.00
6,200.00
6,200.00
Federal Taxes Paid
260.00
480.96
Personal Loss on Cars (d)
524.12
Corrected Adjusted Gross
Income
20,130.64
9,952.18
13,002.10
Less: Standard Deduction
[1](d) 1,000.00
995.22
1,000.00
Corrected Net Income
19,130.64
8,956.96
12,002.10
[2] Personal Exemption 600.00
1,200.00
1,200.00
Corrected Taxable Income
18,530.64
7,756.96
10,802.10
Net Income Shown on
Return
Taxable Income Reflected
on Return (Loss)
[3] 0 2,368.02
4,965.44
Additional Income
[4] $ 18,530.64 $ 5,388.94
$ 5,836.66
*187 With regard to the year 1959 respondent determined that "[the] head of the household tax computation * * * is disallowed for lack of substantiation." Petitioner claimed a dependency exemption for his daughter for each of the years 1950, 1958, and 1959. Respondent has not questioned these exemptions. During the year 1959 petitioner's daughter was enrolled as a candidate for a Master's Degree in social work at Howard University. During parts of that year she lived with petitioner's nurse and petitioner paid the nurse $40 per month for his daughter's room and board. He also paid her school tuition which was approximately $220 for the year. The daughter's school work required that she be stationed in Baltimore, Maryland, for extended periods of time. During the years here involved petitioner failed to keep adequate books from which respondent could determine his correct taxable income. A part of the deficiency for each of the years 1950 through 1959 was due to fraud with intent to evade tax, and the returns for these years were false and fraudulent with intent to evade tax. Petitioner failed to make and file declarations of estimated tax for the years 1950 through 1954. Such *188 failure was not due to reasonable cause. Opinion KERN, Judge: The deficiencies involved in this proceeding were calculated by respondent by means of the net worth plus nondeductible expenditures method. Although petitioner did not allege error as to the use of this method by respondent in either his petition or amended petition, he did deny in his reply the affirmative allegations in respondent's answer justifying the use of such method and contends on brief that the respondent erred in employing the net worth method because there were adequate books and records which reflected petitioner's yearly income for the years before us. Contrary to this contention, we have found that petitioner's books and records for the taxable years were inadequate. No books or records purporting to reflect petitioner's professional income were introduced in evidence and no testimony was adduced which would indicate that such books and records existed. The only book or record purporting to reflect petitioner's rental income consisted of a socalled "spread sheet" which was almost indecipherable upon which petitioner had informally listed certain figures and had made certain calculations. In our opinion *189 the evidence on this point and our Findings amply justify respondent's use of the socalled net worth method in computing petitioner's taxable income for the years before us. See Holland v. United States, 348 U.S. 121; Frank Imburgia, 22 T.C. 1002. Moreover, even if the petitioner's books and records were complete, the net worth method may be applied as a technique for disclosing a substantial discrepancy between actual income and reported income, thereby suggesting the untrustworthiness of the books as a whole. Lipsitz v. Commissioner, 220 F. 2d 871, affirming, 21 T.C. 917. Within the context of respondent's net worth analysis, petitioner made a number of arguments with respect to certain items. In the interest of clarity, we will deal with each of these issues separately. Petitioner argues that the entry of $724.50, representing the "Ice Cuber" for the year 1956, appearing on the schedules included in our Findings, is incorrect. He urges that he did not purchase this item until 1957, but was unable to produce any invoice, document, or cancelled check substantiating this contention. On the record before us we are unable to conclude *190 that respondent erred with regard to this item. Petitioner further argues that the entries for "Prepaid Interest" appearing on the schedules included in our Findings were incorrect. The exact details of his contention are unclear. At the trial petitioner's accountant agreed that the prepaid interest should be reflected as an asset in the net worth statement but asserted that it should be "spread over the life of the loan." It appears to us that this is precisely what the respondent has done. Respondent treated this prepaid interest as an asset, and diminished this asset account when the interest actually became due. He noted the face amount of each note in a corresponding liability account. We feel that respondent's treatment of these items is entirely correct. Prepaid interest is properly an asset as is any other prepaid expense. When a particular installment of interest fell due, respondent diminished this asset account by that amount, and by this diminution automatically gave petitioner credit for a deductible interest expense. We sustain respondent on this issue and have made findings accordingly which are reflected in the schedules included in our Findings. Because of these *191 decreases in petitioner's asset accounts to reflect the interest payments, petitioner's argument urging inclusion of itemized interest deductions in the net worth statement has no merit. To thus itemize these interest expenses would be to give petitioner double deductions for interest. In our opinion the record herein justifies only the taking by petitioner of standard deductions which we have allowed to him in the schedules included in our Findings. Petitioner also argues that the entry designated "Air Conditioner No. 1" on the schedules included in our Findings should appear as an asset in any net worth computation in 1954 rather than in 1955 and should be in a lesser amount than that determined by respondent. He asserts that the amount of $13,618.45 noted by respondent as to the cost of this asset includes a $210.28 sales tax expense which should not be capitalized. As to the year of installation, we have concluded on the record before us that, although petitioner in 1954 entered into a contract (later modified) to purchase an air conditioner, and work preliminary to its installation was begun in that year, the air conditioner was not installed and did not become an asset of petitioner *192 until 1955. However, we agree with petitioner that the sales tax with respect to this item should not be capitalized. Therefore we have found that the cost of this asset was $13,408.17. Our findings with regard to the cost of this asset, together with the down payment and further payments petitioner made in 1955 on this air conditioner with the amount of the corresponding liability for each of the years 1955 through 1958, are reflected in the schedules included in our Findings, together with corresponding adjustments in the accumulated depreciation account for this asset. Petitioner further argues that the amounts respondent determined as proper depreciation deductions on various assets which he held during the years before us were too low. These assets include, inter alia, the buildings on his real estate, several air conditioners, and the Arabian Room. His objection to the respondent's determinations (in addition to the questions of petitioner's basis as to the Benning Road property and the allocation of the depreciation on the automobiles as to business or nonbusiness use which we shall hereinafter consider) is that he regards the percentage rates used by the respondent as incorrect. *193 However, petitioner introduced no evidence as to the proper depreciation rate with regard to any specific item except the testimony of his accountant who expressed his opinion about the proper rates of depreciation for these assets, although he admitted that he had never seen any of them except the Arabian Room where he had been a guest on one occasion. On the record before us we are unable to find that the rates of depreciation as determined by respondent are incorrect. With respect to respondent's computations of depreciation on petitioner's automobiles and the "Personal Loss on Cars" petitioner argues that the determination by respondent that 80 percent of the total use of these automobiles by petitioner was for business purposes is incorrect in view of petitioner's testimony that his use of his automobiles for business constituted 90 percent of their total use. Since the evidence reveals that all of his rental properties were within a radius of 1 mile from his home, and that his office and home were in the same building, and since petitioner himself testified that he drove his automobiles about 14,000 miles each year, we feel that respondent's allocation of use is proper. *194 Petitioner also argues that the inclusion of the prepaid bonuses for real estate loans was incorrectly included as an asset by respondent in the net worth statement. We agree with the respondent on this issue for the same reasons as set forth in our discussion of the prepaid interest, supra. For this reason, we have included these prepaid bonuses in an asset account in the schedules included in our Findings. With regard to the asset item of land located at 2001 Benning Road, N.E., petitioner does not question the original cost figure of $18,562.90 appearing on respondent's net worth statement as of December 31, 1952, but does object to the figures of $20,062.90 appearing for this item in 1953 and subsequent years which was the result of respondent's adding to the original cost of $18,562.90 the sum of $1,500 representing the cost of demolishing in 1953 the building situated on this land when petitioner acquired it in 1952. Petitioner argues that this demolition cost should not be added to the original cost of this property, and further contends that $6,000 of the original cost of the property should be allocated to land and $12,562.90 to the building and that, therefore, petitioner *195 sustained a demolition loss of $12,562.90 in 1953 which should be reflected in any net worth statement for that and succeeding years. The latter argument is not directed to any issue properly presented by the pleadings. Such an issue was not raised in the original petition or in the amended petition filed shortly before the trial. Over 4 months after the trial and after the submission of all of the briefs herein petitioner filed a motion for leave to file a "Second Amendment to Petition," in which this issue was stated for the first time. This motion was denied. Even if this issue of demolition loss, which petitioner contends was in the amount of $12,562.90, were properly before us, the record in this case would not support a decision thereon in favor of petitioner. The record herein does not establish a rational basis for allocating any part of the purchase price of this property to the building situated thereon at the time petitioner acquired it. Testimony adduced by petitioner with regard to its demolition shortly after he purchased it tends to show that it was in bad condition and had little if any value. One of petitioner's witnesses, who was engaged in the real estate business *196 but who had not seen the original building, gave opinion testimony as to an allocation but this was predicated on an assessment of the property for taxation in years subsequent to the demolition of the original building and after the erection of the new building. Thus it would be impossible for us to ascribe the amount of $12,562.90 or any other amount to petitioner's cost of the building on the Benning Road land which was demolished in 1953, even if we should assume, contrary to our view of the pleadings, that the question of a demolition loss, as such, is properly in issue. However, since it is our opinion that the correct cost figure of the land on Benning Road is properly at issue herein, the question of whether respondent erred in adding to the original cost of this property in 1952 ($18,562.90) the sum of $1,500, representing the cost of demolishing the building in 1953, and thus using the figure $20,062.90 as the cost of the property in that and succeeding years is properly before us for decision. It should be noted that the amount of this demolition cost is not in dispute, whereas the original cost basis of the demolished building is in dispute and cannot be ascertained from *197 the record. The respondent in adding the cost of demolition to petitioner's basis of the land acted pursuant to section 1.165-3(a), Income Tax Regs., which by its terms is applicable to those cases in which the taxpayer has an "[intent] to demolish formed at time of purchase." In the instant case we are persuaded by the evidence that petitioner did not have an intent to demolish the building located on the Benning Road property at the time he purchased it in 1952. Even though it was at that time in poor condition and of little value, petitioner hoped to be able to repair and remodel it for his use at the time he purchased the property and, after the purchase, employed a competent architect to make the necessary plans. In the spring of 1953 the architect advised petitioner that it would be impractical if not impossible to do the desired work on the old building, and at that time petitioner formed the intention to demolish the building. Therefore section 1.165-3(a), Income Tax Regs., is not applicable and respondent erred in adding the cost of the demolition to petitioner's basis in the land. The issue in this proceeding which involves *198 the largest amount of money and which occasioned the greatest amount of testimony has to do with the cost of the new building at 2001 Benning Road. As a part of his general contention that the asset items appearing on respondent's net worth statement were overstated, petitioner argues that the total cost of the building, apart from the cost of the land and air-conditioning unit, was $86,006.64 rather than the much larger amount appearing as such cost in petitioner's income tax returns. Respondent contends that the cost of the building was $126,235.66, basing his determination upon figures taken from petitioner's own tax return for 1959. Upon examination of the entire record we have concluded that petitioner overstated the cost of the Benning Road building in his returns with the result that he obtained depreciation deductions larger than those to which he was properly entitled. To some extent the overstatement of the cost of this building as reported in his 1956 and 1957 returns ($139,195.36) was due to the inclusion in such cost of the cost of an air-conditioning and heating unit which was also listed as a separate depreciable item in such returns. However, in his return for 1959 *199 (in which year the cost of the building was shown as $126,245.66, the figure used by respondent in his computations) the cost of the building has been reduced from the figure shown as such cost in 1956 and 1957 by the amount shown in 1956 and 1957 by the amount shown in 1959 as the cost of such air-conditioning and heating unit. We have reached the conclusion that the actual cost of construction of this building in addition to the cost of the air conditioner was $103,877.68 after carefully considering all of the exhibits and third-party records pertaining to its construction. Because of this adjustment made in the cost of the Benning Road building, corresponding adjustments have been made by us in the accumulated depreciation account pertaining to the Benning Road property in the schedules included in our Findings. Another asset, the cost of which is in dispute, is the Arabian Room, a social hall which the petitioner rented to various groups or individuals. Petitioner submitted a "spread sheet" which listed the costs of construction and the various expenses of conducting the business of the Arabian Room. Respondent argues that the cost of building the facilities in the Arabian Room *200 was $14,599.19, and that it had $2,000 worth of glassware and equipment. Petitioner contends that the cost was $15,799.19 and that the equipment cost no more than $100. Petitioner's records, although unclear and poorly arranged, indicate that the total cost of construction plus equipment and noncapital expenses was $16,599.19. After examining this record, we have concluded that the construction costs and capital items pertaining to the Arabian Room amounted to $15,799.19. We have also assigned a cost basis of $200 to the equipment which consisted of assets such as glassware and soda, which the petitioner provided to his patrons. These conclusions, together with corresponding adjustments in the depreciation of the Arabian Room, are reflected in the schedules included in our Findings. Respondent determined that petitioner's living expenses for the years 1950 through 1959 were respectively: $6,100, $4,700, $4,800, $4,900, $5,000, $5,100, $5,200, $5,300, $7,400, and $7,500. Petitioner argues that his living costs could not have exceeded $2,500 per year. The only direct testimony concerning petitioner's cost of living consisted of his own uncorroborated self-serving testimony. This *201 was to the effect that on account of an illness he ate very little, that he spent very little for clothes and insurance, that he rarely went out of his house for entertainment since his principal sources of recreation were watching television and attending social events at the Arabian Room, and that he never had "dates." Certain circumstances tend to corroborate respondent's determination. Petitioner, as an affluent professional man in his community, would naturally have a high standard of living; he drove Cadillac automobiles, and, on occasion, motored to and wagered at racetracks, and went to resorts for vacation trips. After careful consideration of the record relating to this issue, which is not satisfactory, we have concluded that petitioner's cost of living in 1950 was $5,800, during the period 1951 through 1953 was $4,600 per annum, during the period 1954 through 1957 was $4,800 per annum, and during the period 1958 through 1959 was $6,200 per annum. These figures are noted in the schedules appearing in our Findings. Petitioner contends that he is entitled to use, in his computation of tax liability for 1959, the tax rate prescribed for a "head of household" within the *202 meaning of section 1(b)(2) [2] of the 1954 Code. Although it is admitted that petitioner's daughter did not reside in his home during 1959, he argues that the absence of his daughter from his household was a temporary one because of the special circumstances of her studies at Howard University, and that this particular situation is recognized by respondent in section 1.1-2, Income Tax Regs., as constituting an exception to the general rule requiring that a dependent child actually have her principal place of abode in the household of the parent as a condition to the qualification of the parent as "head of household." *203 Respondent contends that petitioner has not met his burden of proof as to his qualification as a "head of household." Although petitioner is correct in stating that a temporary absence of a dependent child from the parent's house "by reason of * * * education" will not disqualify the supporting parent as a "head of household," there are conditions which must be met before this exception to the general rule is effective. Section 1.1-2(c)(1), Income Tax Regs., states in part: Such absence [temporary absence "by reason of * * * education"] will not prevent the taxpayer from qualifying as the head of a household if (i) it is reasonable to assume that * * * such other person will return to the household, and (ii) the taxpayer continues to maintain such household or a substantially equivalent household in anticipation of such return. There is no evidence in the record that petitioner's daughter shared his abode in years prior to 1959 or returned (or planned to return) to his household in subsequent years. Therefore we are unable to assume that petitioner's daughter would return to his household at 2001 Benning Road upon the completion of her studies, or *204 to find that petitioner continued to maintain a household in anticipation of her return. Although the daughter's studies required her to spend a considerable amount of time in Baltimore, it is significant to note the absence of any evidence that she stayed with her father during her sojourns in Washington in 1959. On the contrary, the evidence shows that she resided with his nurse when she was in Washington during this year. Accordingly, we conclude that petitioner is not entitled to compute his taxes for the year 1959 by the use of rates available to a head of a household. Another item in dispute between the parties involves the new roof which petitioner put on the Benning Road building in 1959 at a cost of $1,400 and which was included by respondent in the asset account of petitioner in that year in his net worth computations. Petitioner argues that the "undepreciated value" of the "abandoned" or "replaced" old roof, which petitioner asserts was the sum of $1,200, should have been removed from the asset account because "[otherwise,] you are adding an asset on an asset." The old roof was not depreciated separately and we have no evidence of its cost or "undepreciated value." The *205 only testimony on this point was the opinion testimony of petitioner's accountant to the effect that "the old roof should cost $1200" which he admitted was "an arbitrary figure." Regardless of the validity of the accounting theory propounded by petitioner's accountant, the record before us is such as to make its application to this case impossible since there is a failure of proof as to the undepreciated cost of the old roof. Respondent determined that a part of the deficiency in tax for each of the years 1950 through 1959 was due to fraud with intent to evade tax. Respondent has the burden of proof on this issue and must prove fraud by clear and convincing evidence. Arlette Coat Co., 14 T.C. 751. We feel that he has successfully met this burden. The failure to report "substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent." Schwarzkopf v. Commissioner, 246 F. 2d 731, 734, affirming a Memorandum Opinion of this Court. The consistent pattern of understatement of income by petitioner during the years before us is sufficient evidence of fraud. Kurnick v. Commissioner, 232 F. 2d 678; Epstein v. United States, 246 F. 2d 563; *206 Drieborg v. Commissioner, 225 F. 2d 216. In addition, petitioner admittedly overstated for many of the taxable years and in substantial amounts his cost basis in the Benning Road property. No satisfactory explanation is given by petitioner for the pattern of substantial overstatements of such cost basis in his returns for many of the taxable years. In our opinion such overstatements were false and fraudulent and were made primarily for the purpose of obtaining unwarranted depreciation deductions. We also note that petitioner demonstrated a flagrant disregard for truth in answering questions about his income in the loan applications he made during the years involved. His explanation for these false statements was to the effect that "you have to put things up as high as you can in order to get the money." Petitioner's own testimony demonstrated that he was a person who would not hesitate to make false and fraudulent misstatements in order to obtain a financial advantage. On the record before us, we sustain respondent's additions to tax under section 293(b) of the 1939 Code and section 6653(b) of the 1954 Code. In view of our holding on this issue, we conclude that *207 petitioner's contention that the statute of limitations bars assessment of the deficiencies determined for the years 1950 through 1958 is without merit. Petitioner also failed to file declarations of estimated tax for the years 1950, 1951, 1952, 1953, and 1954. The burden is upon petitioner to prove that his failure to file such estimates was due to reasonable cause and not to willful neglect. Failing such proof he is liable for the additions to tax under section 294(d)(1)(A) of the 1939 Code. Petitioner has not introduced any evidence to explain his failure to file the declarations of estimated tax. Therefore, we find for the respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. Sec. 293(b), 1939 Code.↩
1. The copy of petitioner's return for 1958 which is in evidence is incomplete in that it does not contain a page 3 on which "dividends, interest, rents, pensions, etc." are reported.↩
1. These figures represent petitioner's adjusted gross income as noted in his returns for the taxable years 1956 and 1957. In computing the additional income for these two years, respondent subtracted petitioner's reported adjusted gross income (from which petitioner computed his tax liability by means of tax tables) from petitioner's "Corrected Taxable Income" as determined by respondent.↩
1. Issue concerning entries of $391.68 for the years 1952 through 1954 was conceded by petitioner. ↩
2. Issue concerning entry of $397.50 for the year 1956 was conceded by respondent.↩
1. These figures are 80 percent of the actual cost so as to reflect the 80 percent allocation to business use.↩
1. The standard deduction was subtracted from the petitioner's corrected adjusted gross income because of his failure to prove any of the itemized deductions claimed. ↩
2. We note that respondent computed additional income for the years 1950 through 1954 by subtracting "Net income shown on Return" from "Corrected Net Income." Personal exemptions claimed of $1,200 for 1950 and $600 for 1951 through 1953 were not considered in his computation. Adjustments in the tax liability for these years can be made under Rule 50. ↩
3. These figures were computed from petitioner's adjusted gross income as noted on his returns for the taxable years 1956 and 1957. Those amounts were $2,105.17 and $634.19, respectively, and petitioner computed his tax liability from tax tables. The standard deduction and personal exemption were subtracted therefrom. ↩
4. In computing the additional income for the taxable years 1956 and 1957 respondent subtracted petitioner's adjusted gross income from respondent's "Corrected taxable Income." This method resulted in respondent's determination that for the taxable years 1956 and 1957 the "Additional Income" of petitioner was $19,014.97 and $17,061.28, respectively.↩
2. SEC. 1. TAX IMPOSED. (b) Rates of Tax on Heads of Households. - (2) Definition of head of household. - For purposes of this subtitle, an individual shall be considered a head of a household if, and only if, such individual is not married at the close of his taxable year, is not a surviving spouse (as defined in section 2(b)), and either - (A) maintains as his home a household which constitutes for such taxable year the principal place of abode, as a member of such household, of - (i) a son, stepson, daughter, or stepdaughter of the taxpayer, or a descendant of a son or daughter of the taxpayer, but if such son, stepson, daughter, stepdaughter, or descendant is married at the close of the taxpayer's taxable year, only if the taxpayer is entitled to a deduction for the taxable year for such person under section 151, or (ii) any other person who is a dependent of the taxpayer, if the taxpayer is entitled to a deduction for the taxable year for such person under section 151, or (B) maintains a household which constitutes for such taxable year the principal place of abode of the father or mother of the taxpayer, if the taxpayer is entitled to a deduction for the taxable year for such father or mother under section 151. For purposes of this paragraph and of section 2(b)(1)(B), an individual shall be considered as maintaining a household only if over half of the cost of maintaining the household during the taxable year is furnished by such individual.↩